# USA v. Howard (21-cr-167)
# Competency Determination Oral Ruling Script

## Background

On March 1, 2021, Defendant Sincere Howard was charged with conspiracy to defraud the United States, Kidnapping, and Interstate Domestic Violence. Soon after, Dr. Teresa Grant met with Defendant to perform an evaluation. She was "unable to form an opinion on the defendant's competency[,]" because it was "unclear if an overall lack of effort, malingering, borderline intellectual functioning, or a combination of factors precluded . . . forming a definitive opinion[.]" Gov. Ex. 401. The court then ordered a complete psychological evaluation at the Federal Bureau of Prisons ("BOP") to determine his mental competency. At the BOP, Dr. Cynthia Low also evaluated him and opined that Defendant "appeared to demonstrate an inadequate ability to understand the nature and consequences of the court proceedings against him, but demonstrated a sufficient ability to properly assist counsel in his defense." Gov. Ex. 402. According to that report, he "does not meet criteria for any major mental disease or defect." *Id.* Ultimately, though, Dr. Low was "unable to opine about his true capacity," as his poor communication "was viewed to be volitional." *Id.*

In April 2022, Dr. Jonathan DeRight, a defense-retained expert, evaluated Defendant and found that he had adequate knowledge of the legal system, but he did not demonstrate the ability to apply that knowledge to make informed decisions in his case or evidence adequate abilities to assist his attorney in his own defense. The government had no objection to Dr. DeRight's finding that Defendant was not presently competent to stand trial. On June 8, 2022, the court found Defendant to be incompetent and committed Defendant to the custody of the U.S. Attorney General for a maximum period of four months to determine whether he could regain competency or gain competency to proceed to trial. 18 U.S.C. § 4241(d).

On February 22, 2023, the BOP certified that Defendant was competent to stand trial. Certificate of Restoration of Competency from David Paul, Warden of FBP, ECF No. 62. At a status hearing on May 4, 2023, defense counsel informed the court of their intention to challenge that determination.

The court then set another competency hearing to determine whether Defendant was competent after the restoration process to proceed to trial. The court held a hearing over the course of two days and heard closing arguments on March 21, 2024.

## Legal Standard

The court begins with the legal framework for competency determinations.

"[T]he Constitution does not permit trial of an individual who lacks 'mental competency.'" *Indiana v. Edwards*, 554 U.S. 164, 128 (2008); *see* 18 U.S.C. § 4241(d). Under the Constitution's mental competence standard, the court must determine "(1) 'whether' the defendant has 'a rational as well as factual understanding of the proceedings against him' and (2) whether the defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" *Indiana*, 554 U.S. at 170 (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

There is a Circuit split on who bears the burden of proof. *See, e.g.*, *United States v. Nichols*, 56 F.3d 403, 410 (2d Cir. 1995). "[T]he allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases[.]" *Medina v. California*, 505 U.S. 437, 449 (1992). Still, the government here has agreed to assume the burden. Closing Arg. Hr'g Tr. (draft), March 21, 2024, at 3:4-10.

## Discussion

The court considered reports and testimony from both the government and defense experts, recordings of certain telephone calls made by Defendant, BOP disciplinary reports, various assessments administered to Defendant, and Defendant's demeanor before the court. The court will briefly summarize the two testifying experts' reports and then explain its findings.

Government's Expert

The government's expert, Dr. Haley Wentowski, a forensic psychologist for the BOP, testified at the hearing and provided a report. Hr'g Tr. (draft), February 26, 2024 [hereinafter Tr.], at 23:12; Gov. Ex. 102.

Dr. Wentowski met with Defendant on 13 formal occasions between September 28, 2022, and January 25, 2023, for a total of six hours and 45 minutes. Tr. at 38:2-6, 70:9. She interacted with him on other occasions as well, which included weekly restoration unit community meetings. *Id.* at 38:16-21. As her office was located in

Defendant's unit, she frequently observed him "socializing with other people or coming from recreation." *Id.* at 39:2-8. She estimated that she saw him about every day for that four-month period. *Id.* at 39:12-13.

For her March 2023 report, she reviewed past forensic reports from other psychologists, school records, and discovery material. *Id.* at 39:21-24. She summarized the various tests administered to Defendant: (1) the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV); (2) the test of memory malingering (TOMM); and (3) the inventory of legal knowledge test (ILK). *Id.* at 40:12-16. On the WAIS-IV, he received a lower IQ score than he had in previous evaluations, indicating to her a poor effort. *Id.* at 70:17–71:5; Gov. Ex. 102, at 1. His low score on the ILK (25/61) was one point away from indicating that he "deliberately suppressed correct responses." Tr. at 74:24–75:1; Gov. Ex. 102, at 2. She interpreted his performance on the ILK as suggesting that "some suppression was occurring," with the qualification that the test is not validated for individuals with intellectual impairments. *Id.* at 75:6-9. His score on the TOMM, which also measures effort, suggested that he was guessing. *Id.* at 71:19–72:18.

Dr. Wentowski reviewed a 2017 educational report from Dr. Gilliard, Gov. Ex. 201, which documented his history of learning disabilities in reading, written expression, and arithmetic. The report noted his disengagement when tasks increased in difficulty. *Id.* at 44:2-12. The educational report also documented Defendant's IQ score of 70, Gov. Ex. 201, at 6, but noted that Defendant's adaptive functioning was not impaired such that he did not meet criteria for an intellectual disability. Gov. Ex. 201, at 13–14. At the hearing, Dr. Wentowski explained that "[j]ust because someone's IQ is below average doesn't mean that they're incapable of understanding things or assisting . . . in their defense." Tr. at 46:14-16.

In Dr. Wentowski's opinion, Defendant "exaggerated cognitive deficits throughout the evaluation period." She found that his presentation was "best characterized as disinterested and unmotivated without concern about being found competent or incompetent," such that he "lacks the motivation to be an active defendant and assist on his behalf." This "is not due to mental disease or defect," she reported.

She provided an addendum in January 2024 in advance of the hearing. Gov.'s Ex. 103. In this later report, she also considered a letter from defense expert Dr. Jonathan DeRight, 48 jail calls from between June 6, 2023, and July 6, 2024, and his criminal

3

docket report. At the hearing, she described the almost 17 hours of jail calls that she had listened to. Tr. at 87:19. She found that he "displayed organized, goal-directed thoughts," "exhibited no signs of distraction suggestive of psychosis," "asked questions reflective of an intact memory," and "tracked information within and across phone calls." Gov. Ex. 103, at 2. In sum, she wrote in her addendum, "there were no indications of gross cognitive impairment." *Id.* She maintained her previous diagnoses and opinion that he does not suffer from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceeding against him or properly assist in his defense. *Id.* at 7.

Defendant's Expert

Dr. Jonathan DeRight, a clinical and forensic neuropsychologist, testified for the Defendant. He previously evaluated Defendant in the spring of 2022, and in May 2022 opined that Defendant was incompetent to stand trial due to longstanding intellectual deficits that led to an insufficient rational understanding and ability to assist in his own defense. Dr. DeRight "also opined that he was unlikely to be restored given the longstanding nature of his intellectual deficits and the lack of response to such deficits using traditional restoration techniques." He relied on the Dr. Gilliard's educational report, Defendant's IEP, and Dr. Low's evaluation, and administered a number of psychological tests. He based his conclusion on his own behavioral and mental observations and results from the tests he administered.

Dr. DeRight met with Defendant again on August 21, 2023. On January 8, 2024, he wrote to defense counsel and maintained his "opinion that there has not been new information to indicate a substantial probability that Mr. Howard would attain the capacity to permit the proceedings to go forward in the foreseeable future." He explained that Defendant "was unable to describe the basic way in which it could be shown how someone is guilty at trial" and evidenced only a superficial understanding of the concepts of evidence and a jury. He reaffirmed his findings from his 2022 report.

Findings

The court now articulates its findings:

The parties do not dispute that Defendant has an adequate factual understanding of the legal proceedings against him. Hr'g Tr. (draft), March 21, 2024 [hereafter March Tr.], at 5:1-2. As to Defendant's rational understanding and ability to assist counsel, the court finds that the government's evidence is more persuasive than Defendant's. The court's review of phone calls, BOP records of disciplinary proceedings, and the various assessments demonstrates Defendant's sufficient capacity for rational understanding and assisting his attorney.

The court first considers the recorded BOP phone calls. They are instructive as to Defendant's ability to apply his understanding of legal proceedings to the facts of his own case. Dr. Wentowski testified that the calls demonstrate that Defendant "is able to accurately explain to others what has happened in the courtroom and [] talk about working with his attorney to get a plea deal," as he talked about his co-defendant's plea deal, potential sentences, and his understanding that his case could not move forward until the competency issue was resolved. Tr. at 88:2-7. The court agrees.

Specifically, in one call, he referred to his codefendant and told the other person on the call that his codefendant was offered a plea bargain of six years. *Id.* at 89:21-24. He then discussed the fact that he had already served two years at that time, and estimated that if he received a similar deal, he would get out within a couple years. *Id.* at 90:12-16. In another call, he spoke about "his lawyer needing time to figure out his case so he can get out." *Id.* at 91:16-17. He also explained what a status hearing was and that the court needed to address his psychiatric situation before determining his sentence. *Id.* at 95:13-24.

Around the time of that mentioned status conference, in additional phone calls, Defendant discussed the competency hearing. The other speaker informed him that she had spoken with his attorney, and she said that once his competency issue was resolved, then his attorney would ask for a plea. *Id.* at 97:8-12; Gov. Ex. 504. Defendant asked what type of plea his attorney was going to ask for, demonstrating some basic knowledge of plea bargains and the role of his attorney in the system. *Id.* at 97:13-17. He corrected the call recipient on the amount of time he had already

5

served—he had served two and a half years, not three. *Id.* at 97:22-23. Defendant asked if his codefendant was going to take the offered plea deal, *id.* at 97:24-25, and the other person said "yes," *id.* at 98:1-2. Defendant responded: "If they doing him like that, he got way more Criminal History points than me and all that. You feel me? They better offer me something." *Id.* at 98:3-5; Gov. Ex. 504 (the audio at the end of the call is difficult to discern).

The contents of that conversion conflict with how Defendant presented during some of his evaluations, in which he told evaluators that he did not understand the Federal Sentencing Guidelines. Tr. at 98:8-20. On the call, he was able to weigh his codefendant's plea situation and assess how it might apply in his own case. He also applied the concept of Criminal History points to his own case and rationally assessed how that might affect his sentence.

Dr. DeRight interprets this evidence differently. He viewed the excerpts as isolated, one-off examples. According to Dr. DeRight, Defendant may not actually understand the terms used in the call, and he was merely parroting terms he has heard elsewhere without grasping their meaning. *See* March Tr. 25:16-20. That is a possibility, but not the most likely one. There are enough examples of these calls for the court to say that Defendant's use of a legal term is due to his own rational understanding. He is not just repeating statements or concepts introduced by someone else, he is initiating conversations about aspects of his case, responding to questions, and correcting and explaining to the call recipient. He discussed pleas, status conferences, a defendant's criminal history's impact on the Sentencing Guidelines, and his attorney's actions. In doing so, Defendant has exhibited some understanding of the process, the roles of individual actors, and how they apply in his case. *United States v. Pervis*, 937 F.3d 546, 558, 558 n.9 (5th Cir. 2019) (finding that the district court's interpretation of defendant's prison phone calls was reasonable, despite counsel's dispute over the proper interpretation of them).

Reports from BOP disciplinary proceedings illustrate Defendant's capacity as well. Individuals in BOP competency restoration units are assessed for competency in advance of internal disciplinary proceedings. Tr. at 49:2-12. Defendant was assessed 11 times, and each time the evaluating psychologist found that he was competent to proceed in the disciplinary process. *Id.* at 50:8-12.

In one instance, Defendant was alleged to have possessed an unauthorized pill. Gov. Ex. 303. Dr. Wentowski inferred from the incident report that "[h]e knew that he had been served with an incident report, and he also offered essentially a defense stating that he had a cellmate and the pill belonged to a cellmate." Tr. at 51:9-11. That indicated to her "an ability to assist in his own defense . . . [b]ecause he had an explanation—or he had a response to the allegations that was logical and . . . coherent." *Id.* at 51:9-17.

Dr. Wentowski testified about another disciplinary incident as well. Gov. Ex. 304. Defendant was charged with threatening another with bodily harm and refusing to obey an order, among other things. *Id.*; Tr. at 52:12-13. He provided a statement, which was essentially a defense, that the individual who wrote him up fabricated the incident to get him sent to the Special Housing Unit. Tr. at 52:18-20. Other prison incident reports illustrate the same capacities of Defendant to understand allegations against him and the types of appropriate defenses and responses. Gov. Exs. 305–310.

Defendant urges the court to place little weight on these BOP disciplinary proceedings because they lack the complexity of federal criminal proceedings. The court has no qualms with the general point that the criminal justice system is more complex than an institutional disciplinary proceeding. Still, this evidence, including the absence of any determinations of incompetency, bolsters the court's interpretation of other evidence, such as the recorded phone calls.

Dr. Wentowksi also testified about an instance in which Defendant reported that a staff member touched him inappropriately. Tr. at 67:8-12. Dr. Wentowski escorted him to the lieutenant's office to determine if the alleged conduct fell under the Prison Rape Elimination Act (PREA). Dr. Wentwoski testified that Defendant clearly articulated what happened, and that "he understood the rules and what was expected of staff." *Id.* at 67:13-17. Defendant also provided relevant answers to follow up questions. *Id.* at 67:17-19. When the lieutenant informed him that the allegation did not meet the criteria for opening a case, Defendant comprehended "and was able to go back to the unit and move forward." *Id.* at 67:20-22.

Dr. Wentowski provided additional useful observations on how he functioned outside evaluative settings. She discussed his interactions with other incarcerated individuals. *Id.* at 86:1-21. In those contexts, he acted "in a more socially

7

appropriate manner" and seemed more animated and engaged than he did in sessions with her and other prison staff. *Id.* at 86:15-16.

In *United States v. Battle*, the defendant conceded that he had a rational and factual understanding of the proceedings but contested his "present ability to consult with his attorney." 613 F.3d 258, 262 (D.C. Cir. 2010). The D.C. Circuit upheld the competency determination, and the trial court's ultimate agreement with the government's expert, because that expert had observed the defendant while in custody for two month-long observation periods, while the defense expert met with the defendant on only three days. *Id.* at 262–63. Here, the court does assign more weight to Dr. Wentowski's conclusions as she observed him regularly over a four-month period, while Dr. DeRight only met with Defendant two times for a total of four and a half hours. March Tr. 44:17-22.

In addition, there is ample evidence to support the Dr. Wentowski's conclusion that Defendant's lack of engagement across various evaluative settings is based on a lack of will, not capacity. The court is not saying that this lack of effort is unrelated to cognitive deficits, which is what makes it difficult to form a fully accurate assessment of his cognitive abilities. But, as previously described, his performance on the WAIS-IV, TOMM, and ILK, though not conclusive, all suggested poor effort. In particular, his ILK and TOMM scores, although not establishing malingering, corroborate Dr. Wentowski's observations of months of Defendant not putting forth meaningful effort to become familiar with legal concepts and situations. In light of these findings, the court need to resolve the parties' dispute about the value of Defendant's performance on the MacCAT-CA test.

The Fifth Circuit in *United States v. Pervis* addressed a defendant who demonstrated "poor effort" and had low intellectual functioning similar to Defendant here. 937 F.3d at 555. Various tests performed by psychologists suggested "strong indications of malingering." *Id.* at 556. The defendant's poor testing in that case diverged from observations made of him socializing and making use of resources in the unit, among other things. *Id.* The court acknowledged that "the Supreme Court cast doubt on the informational value of behavior observed in correctional settings and on analysis emphasizing adaptive strengths to the exclusion of adaptive deficits," but the defendant's "intentionally poor effort and the dubiousness of other available information left the district court little better material with which to evaluate [the defendant's] adaptive functioning." *Id.* at 557.

In conclusion, the D.C. Circuit has emphasized that the relevant legal question is not whether appellant will "assist properly in his defense," but whether "he [is] *able* to do" so. *Battle*, 613 F.3d at 263 (quoting *United States v. Vachon,* 869 F.2d 653, 655 (1st Cir.1989)); *see also United States v. Simpson*, 645 F.3d 300, 306 (5th Cir. 2011) (holding that the defendant's refusal to cooperate with his attorney did not render him incompetent when "it within his voluntary control"); *United States v. Robinson*, 404 F.3d 850, 857 (4th Cir. 2005) (holding that a defendant with low IQ and limited intellectual ability who "had trouble staying on task and did not always appear to give full effort to the testing" still had "at least a minimal understanding of legal procedures, rules and expectations").

By that standard, the government has shown by a preponderance that Defendant has an adequate rational understanding of the proceedings against him and an ability to assist his counsel. He has shown an understanding of plea negotiations, as evidenced by his jail calls. His interaction with the prison disciplinary process, albeit less complex and not identical to a trial, shows that he understands the importance of evidence, witnesses, and raising defenses. And to the extent there are deficits in his knowledge and understanding, some of it is attributable to cognitive limitations but some it also is because of a lack of effort, as evidenced by his testing results and Dr. Wentowski's observations over a four-month period.

The court acknowledges the challenge of representation in this case for defense counsel. But the Ninth Circuit has said "[t]he fact that a defendant might not understand the proceedings unless they are explained to him in simple language would put an additional burden upon counsel, but certainly does not establish that the defendant is incompetent to stand trial." *United States v. Glover*, 596 F.2d 857, 867 (9th Cir. 1979).

## Conclusion

Despite the court's earlier finding of incompetence, the court now has the benefit of additional expert observations, reports, BOP phone calls, and an evidentiary hearing—in sum, a more fulsome record. Based on that record, the court concludes that Defendant is competent to stand trial.